UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AENERGY, S.A., and COMBINED CYCLE POWER PLANT SOYO, S.A.,<br>*Plaintiffs,*<br><br>v.<br><br>GE CAPITAL EFS FINANCING, INC.,<br>*Defendant,*<br><br>and,<br><br>GENERAL ELECTRIC INTERNATIONAL, INC.,<br>*Defendant.* | Nos. 3:22-cv-1054 (JAM)<br>3:22-cv-1055 (JAM) |

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Plaintiffs Aenergy, S.A. ("AE") and Combined Cycle Power Plant Soyo, S.A. ("CCPP") have filed two related actions against defendants GE Capital EFS Financing, Inc. ("GE Capital") and General Electric International, Inc. ("GE International") alleging that the defendants' tortious conduct caused the plaintiffs to lose out on wind- and energy-related projects with the Angolan government to the tune of roughly $1.1 billion.

Both defendants have filed motions to dismiss. They principally argue that the plaintiffs' suits are precluded by a ruling of the Southern District of New York finding that an earlier incarnation of this lawsuit should be dismissed for *forum non conveniens*. In the alternative, the defendants argue that the case should be dismissed on grounds of *forum non conveniens*. Although I decline to find that the prior ruling has preclusive effect, I conclude that *forum non conveniens* requires dismissal of this lawsuit. I will conditionally grant the motions to dismiss subject to the filing of a stipulation by the defendants with respect to the litigation of this case in Angola.

1

BACKGROUND

According to the complaints, AE is a shareholder-owned corporation constituted under the laws of the Republic of Angola and headquartered in Portugal.[1] Ricardo Machado, a Portuguese citizen, founded the company in 2012 and owns 99.9% of its stock. *See Aenergy, S.A. v. Republic of Angola*, 2021 WL 1998725, at *1 (S.D.N.Y. 2021). CCPP is a wholly owned subsidiary of AE, incorporated in Angola with its principal commercial activities undertaken in Angola.[2]

In 2013 AE began contracting with corporate affiliates of General Electric Co. to purchase GE-made power products and services for energy projects commissioned by the Angolan Ministry of Energy and Water ("MINEA").[3] After a number of successful projects AE and GE began discussing a "mega" power deal to market to the Angolan government whereby AE would install and service a series of power-plant facilities in Angola using GE-manufactured technology.[4] As part of the deal AE agreed to purchase fourteen TM2500s (a gas turbine GE describes as a "power plant on wheels") from GE for anticipated deployment in Angola.[5]

AE and GE knew that to finance these energy projects the Angolan government would have to secure an international source of funding.[6] So in 2017 Jeff Immelt—then-CEO of GE Co.—travelled to Angola to meet with then-President José Eduardo Dos Santos of Angola.[7] The two reached an agreement under which GE Capital would provide $1.1 billion to Angola's

---

[1] Doc. #3/1054 at 4 (¶ 9); Doc. #4/1055 at 4 (¶ 9).
[2] Doc. #3/1054 at 4 (¶ 10); Doc. #4/1055 at 4 (¶ 10).
[3] Doc. #3/1054 at 7-8 (¶¶ 25, 28); Doc. #4/1055 at 7-8 (¶¶ 25, 28).
[4] Doc. #3/1054 at 9-10 (¶¶ 29-30); Doc. #4/1055 at 9 (¶¶ 29-30).
[5] Doc. #3/1054 at 9, 11-14 (¶¶ 28(c), 35, 39, 42-43); Doc. #4/1055 at 8-9, 11-14 (¶¶ 28(c), 35, 39, 42-43).
[6] Doc. #3/1054 at 10 (¶ 31); Doc. #4/1055 at 9-10 (¶ 31).
[7] Doc. #3/1054 at 10 (¶ 32); Doc. #4/1055 at 10 (¶ 32).

finance ministry ("MINFIN"), which Angola would draw up front to prepay AE for the agreed-to energy projects.[8]

GE Capital and GE Co. approved the $1.1 billion credit facility in late June or early July 2017 based on their assumption that Angola had agreed to purchase at least twelve TM2500s paid for upfront.[9] The President of Angola similarly approved the financing plan, and then at the end of July 2017 AE and MINEA executed a total of thirteen "On-Sale Contracts" ("OSCs") in the amount of $1.148 billion.[10] But the OSCs collectively called for only eight TM2500 turbines—six fewer than the total number AE had agreed to buy from GE and four fewer than GE had anticipated when it approved the financing deal.[11]

AE promptly sent the signed OSCs to GE.[12] Machado then explained to Wilson da Costa—who was employed by GE International but represented GE Capital in Angola—that the signed contracts covered only eight turbines.[13] Unbeknownst to AE however, da Costa then informed his colleagues at GE Co. and GE Capital that the OSCs covered twelve TM2500s and that AE would use its margin on the OSCs to pay for two additional turbines, bringing the total back up to the originally agreed-to fourteen turbines.[14]

In August 2017 representatives from AE and GE Capital met to begin planning for the financing disbursement.[15] The GE participants were surprised to learn that the existing OSCs called only for eight turbines, while AE was surprised to learn that GE expected to be paid for fourteen turbines.[16] To resolve the discrepancy AE agreed to use its "best efforts" to amend its

---

[8] Doc. #3/1054 at 15 (¶ 44); Doc. #4/1055 at 15 (¶ 44).
[9] Doc. #3/1054 at 18 (¶ 48); Doc. #4/1055 at 18 (¶ 48).
[10] Doc. #3/1054 at 19-20 (¶ 50); Doc. #4/1055 at 19-20 (¶ 50).
[11] Doc. #3/1054 at 21 (¶ 51); Doc. #4/1055 at 20-21 (¶ 51).
[12] Doc. #3/1054 at 21-22 (¶ 54); Doc. #4/1055 at 21-22 (¶ 54).
[13] *Ibid.*
[14] Doc. #3/1054 at 22 (¶ 55); Doc. #4/1055 at 22 (¶ 55).
[15] Doc. #3/1054 at 22-23 (¶ 56); Doc. #4/1055 at 22-23 (¶ 56).
[16] *Ibid.*

contracts with Angola to add six turbines to the existing OSCs without increasing the overall cost.[17] When AE explained that Angola could only formally amend the OSCs via a presidential decree, GE responded that it could rely on "technical letters" to confirm the addition of the first four turbines as long as those letters met certain wording requirements.[18]

AE subsequently asked MINEA to sign amendment letters adding two additional turbines to OSCs 7 and 11 using the language requested by GE.[19] Angola responded, not with a firm commitment but with conditional intent letters stating their agencies would consider purchasing four additional turbines subject to technical analyses and legal review.[20] The intent letters were provided to da Costa, who told Machado that he would transmit them to relevant individuals at GE.[21]

Unbeknownst to AE, after receiving the documents from Angola, unspecified "GE employees" used Photoshop to edit the letters to reflect the language GE wanted.[22] Then on the evening of October 12, "from the safety and secrecy of his home in Luanda," da Costa took photos of the forged letters and emailed those photos to various GE employees, passing them off as the real documents.[23] In his email attaching the forged letters, da Costa reported that "[w]e got the contract number 7 signed with the languages that we agreed on and countersigned by AE. We then . . . got contract number 11 amendment signed with the language approved by Brad [Galvin of GE Capital] and then counter signed by AE."[24] Leslie Nelson, da Costa's then-supervisor at

---

[17] Doc. #3/1054 at 25-26 (¶ 61(a)); Doc. #4/1055 at 25-26 (¶ 61(a)).
[18] Doc. #3/1054 at 26, 29 (¶¶ 61(b), 70); Doc. #4/1055 at 26, 29 (¶¶ 61(b), 70).
[19] Doc. #3/1054 at 29 (¶ 68); Doc. #4/1055 at 29 (¶ 68).
[20] Doc. #3/1054 at 29-30 (¶ 71); Doc. #4/1055 at 29-30 (¶ 71).
[21] Doc. #3/1054 at 30 (¶ 72); Doc. #4/1055 at 30 (¶ 72).
[22] Doc. #3/1054 at 30 (¶ 73); Doc. #4/1055 at 30 (¶ 73).
[23] Doc. #3/1054 at 30-31 (¶ 74); Doc. #4/1055 at 30-31 (¶ 74).
[24] Doc. #3/1054 at 31 (¶ 75); Doc. #4/1055 at 31 (¶ 75).

GE International, also assured another GE executive a few days later that the critical amendments had been obtained from MINEA.[25]

With all parties under the impression that the problem had been resolved, Angola finally drew its initial disbursement from the GE Credit Facility in December 2017.[26] The request referenced specific AE invoices that MINEA was paying for with the disbursement and reflected that the money was going towards only eight TM2500s.[27] Executives at GE Capital and GE Co. approved the payment.[28] GE Capital then finalized GE's internal allocation of the disbursement, applying the money towards twelve of the fourteen turbines, as well as towards partial payment on turbines thirteen and fourteen, seemingly without reference to the invoices attached to the disbursement request.[29] GE then shipped the rest of the turbines to Angola.[30]

Work proceeded under the contracts.[31] In December 2018, MINEA, MINFIN, AE, and da Costa met to discuss the possibility of Angola amending its OSCs to purchase four extra turbines (on top of the eight they thought they had already bought).[32] Da Costa objected, stating that MINEA had already purchased twelve turbines when it made the initial withdrawal in December 2017, and AE was therefore trying to double charge Angola for the turbines.[33] Da Costa then showed Angola's representatives digital copies of the forged October 12 letters, which showed that Angola had already committed to binding amendments to add four turbines to the existing

---

[25] Doc. #3/1054 at 31-32 (¶ 76); Doc. #4/1055 at 31 (¶ 76).
[26] Doc. #3/1054 at 38 (¶ 92); Doc. #4/1055 at 38 (¶ 92).
[27] *Ibid.* As the complaint explains, the invoices had not been amended to reflect the October 12 letters because as far as Angola knew, those letters merely preserved the option to increase the number of turbines Angola purchased but did not commit them to anything. *See* Doc. #3/1054 at 35-36 (¶ 87); Doc. #4/1055 at 35-36 (¶ 87).
[28] Doc. #3/1054 at 39 (¶¶ 93-94); Doc. #4/1055 at 38-39 (¶¶ 93-94).
[29] Doc. #3/1054 at 40 (¶ 96); Doc. #4/1055 at 39-40 (¶ 96).
[30] Doc. #3/1054 at 40 (¶ 97); Doc. #4/1055 at 40 (¶ 97).
[31] Doc. #3/1054 at 41 (¶ 99); Doc. #4/1055 at 40-41 (¶ 99).
[32] Doc. #3/1054 at 43 (¶ 107); Doc. #4/1055 at 43 (¶ 107).
[33] Doc. #3/1054 at 43-44 (¶ 108); Doc. #4/1055 at 43-44 (¶ 108).

OSCs.[34] But MINEA confirmed against its own files that da Costa's version of the letters had been altered and demanded that AE and GE clarify their positions.[35]

A few weeks later da Costa and his new supervisor Elisee Sezan met again with MINEA representatives, and they explained that according to GE's records Angola had already paid AE for twelve turbines.[36] Representatives of GE Capital met separately with AE to explain that according to the documentation GE received, the disbursement in 2017 permitted funding for twelve turbines, not eight.[37] When AE asked to see the documents in question, the GE participants declined to produce them.[38]

Despite AE's attempts to clarify the situation, MINEA alerted AE that due to irregularities with the GE Capital financing line it intended to terminate the OSCs and transfer the contracts to GE.[39] After confirming that GE could execute the work contemplated in the AE-MINEA contracts, MINEA formally terminated the OSCs with AE on September 2.[40] It pointed to "purported but unspecified irregularities by AE related to the acquisition of 4 Turbines under the credit line made available by GE Capital."[41] MINEA also explained that it was seizing additional turbines AE had acquired from GE and which were still awaiting a project.[42]

At around this time Angola also terminated another project it had awarded to CCPP at the Soyo II power plant in the Zaire province of Angola.[43] The MINEA letter terminating the Soyo

---

[34] *Ibid.*
[35] Doc. #3/1054 at 44 (¶ 109); Doc. #4/1055 at 44 (¶ 109).
[36] Doc. #3/1054 at 46 (¶ 112); Doc. #4/1055 at 45-46 (¶ 112).
[37] Doc. #3/1054 at 50 (¶ 124).
[38] *Ibid.*
[39] Doc. #3/1054 at 47 (¶ 115); Doc. #4/1055 at 47 (¶ 115).
[40] Doc. #3/1054 at 54-55 (¶ 136); Doc. #4/1055 at 54-55 (¶ 135).
[41] Doc. #3/1054 at 55 (¶ 137); Doc. #4/1055 at 55 (¶ 136).
[42] *Ibid.*
[43] Doc. #3/1054 at 55-56 (¶ 139); Doc. #4/1055 at 56 (¶ 139).

II concessions cited the same documentation irregularities the agency had invoked in support of its decision to terminate the OSCs.[44]

On May 7, 2020, plaintiffs AE and CCPP filed an action in the Southern District of New York against GE Co., GE International, GE Capital, the Republic of Angola, MINEA, MINFIN, PRODEL, and ENDE (Angola's state-owned power companies). *See Aenergy*, 2021 WL 1998725, at *7. The complaint asserted four counts against the GE defendants for tortious interference with contract, tortious interference with prospective business relations, an accounting claim, and an aiding and abetting claim. *Ibid.*

Judge Cronan granted the Angolan and GE defendants' motion to dismiss for *forum non conveniens*. He concluded that "Angolan companies that do business in Angola and with the Angolan government surely cannot be surprised that they must litigate their claims in Angola." *Ibid.* On appeal the Second Circuit affirmed. *See Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119 (2d Cir. 2022). The Supreme Court denied certiorari. *See Aenergy, S.A. v. Republic of Angola*, 143 S. Ct. 576 (2023).

In the meantime, the plaintiffs filed the present related actions here in the District of Connecticut against defendants GE Capital and GE International, respectively. The substantially identical complaints allege three counts against GE Capital—for tortious interference with contract, tortious interference with prospective business relations, as well as a claim under the Connecticut Unfair Trade Practices Act (CUTPA)—and five counts against GE International— for tortious interference with contract (Counts One and Two), tortious interference with prospective business relations (Counts Three and Four), and a CUTPA claim.

---

[44] *Ibid.*

The defendants have moved to dismiss. They argue in part that the complaints are barred by collateral estoppel in light of the prior New York litigation and, alternatively, that the complaints should be dismissed on the ground of *forum non conveniens*.

## DISCUSSION

The standard that governs a motion to dismiss under Rule 12(b)(6) is well established. A complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain a plaintiff's claims for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018). A court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). While a court typically cannot consider documents outside the complaint on a motion to dismiss, it may rely on both the pleadings and attached affidavits when deciding a motion to dismiss for *forum non conveniens*. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014).[45]

### *Collateral estoppel*

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365, 371 (2d Cir. 2023). While ordinarily "[d]ismissal on forum non conveniens grounds does not establish . . . issue preclusion as to other courts because the convenience issues are intrinsically different, [] issue preclusion is appropriate if the issue actually remains the same." CHARLES ALAN WRIGHT

---

[45] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

& ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4436; *see also Seales v. Panamanian Aviation Co.*, 356 F. App'x 461, 465 (2d Cir. 2009) (same).

Although much of the *forum non conveniens* analysis in this case mirrors that of the prior litigation in the Southern District of New York, I am not convinced that all the issues presented in this case are identical or that the evidence is the same in light of the passage of time. For example, the question of whether the plaintiffs' claims are now time-barred in Angola presents a new issue not amenable to preclusion, and the plaintiffs also allude to new evidence regarding whether they can obtain a fair adjudication of their claims in Angola. *See Seales*, 356 F. App'x at 465 (declining to apply issue preclusion for purposes of *forum non conveniens* where "the introduction of new evidence altered the balance of the convenience factors and justified the district court's reconsideration of the issue"). "A trial court . . . is generally accorded broad discretion in determining whether or not collateral estoppel should apply in a given case." *Flood v. Just Energy Marketing Corp.*, 904 F.3d 219, 236 (2d Cir. 2018). I decline to apply collateral estoppel grounds and instead proceed directly to the merits of the defendants' claim that this action should be dismissed on the ground of *forum non conveniens*. In so doing, however, I am largely guided by Judge Cronan's analysis as affirmed by the Second Circuit, even if I do not give preclusive effect to the result of this prior litigation.

### Forum non conveniens

The doctrine of *forum non conveniens* gives federal courts discretion to dismiss a case "when an alternative forum has jurisdiction to hear the case, and trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping*

*Corp.*, 549 U.S. 422, 429 (2007). The Second Circuit has set forth a three-step process for determining when a motion should be dismissed for *forum non conveniens*. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) (*en banc*). First, a court must determine how much deference to give the plaintiffs' choice of forum. *Id.* at 70-73. Second, a court should evaluate whether there exists an adequate alternative forum for the action. *Id.* at 73. Third, a court must balance private and public interest factors to decide whether the case should be adjudicated in the plaintiffs' chosen forum or in the alternative forum suggested by the defendant. *Id.* at 73-74; *see also Olin Holdings Ltd. v. State*, -- F.4th --, 2023 WL 4479318, at *11 (2d Cir. 2023) (same).

### *Step one—deference to plaintiffs' choice of forum*

"Any review of a *forum non conveniens* motion starts with a strong presumption in favor of the plaintiffs' choice of forum." *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 154 (2d Cir. 2005). But this presumption is not dispositive and "may be overcome." *Iragorri*, 274 F.3d at 71. In determining how much weight to give the plaintiffs' choice of forum, courts consider the "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.* at 72. And if it appears that the plaintiff's choice was motivated by reasons of forum shopping, then courts will accord the plaintiff's choice less deference. *Ibid.*

Balancing these factors, Judge Cronan afforded the plaintiffs' choice of forum in New York "minimal deference." *Aenergy*, 2021 WL 1998725, at *9. I see no reason to reach a different result here.

First, as was true in the New York action, the plaintiffs remain Angolan companies. And as foreign plaintiffs, their choice to sue in a United States court is afforded "less deference." *Ibid.* (citing *Monegasque De Reassurances S.A.M.*, 311 F.3d 488, 498 (2d Cir. 2002)).

The plaintiffs respond that since Judge Cronan issued his decision, their business in Angola has been "entirely destroyed," and they "no longer have any business activities in Angola."[46] Instead, all of the plaintiffs' former executives have moved back to Portugal, and so the plaintiffs are now at home in Portugal rather than in Angola.[47]

But that is no reason why the *corporate* plaintiffs are no longer at home in Angola—both companies remain incorporated in Angola and so remain at home in Angola, even if they may also be at home in Portugal.[48] *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014) (corporation is at home in place of incorporation as well as in its principal place of business); *Norex Petroleum Ltd.*, 416 F.3d at 155 (plaintiff's home fora included Canada, its principal place of business, and Cyprus, its place of incorporation). And whether plaintiffs are Angolan or Portuguese does not change the fact that they are foreign plaintiffs whose choice of a United States forum is given less deference.

Second, that this consolidated action is now in the defendants' home district does not tip the scales in this forum's favor. Both GE defendants have principal places of business in Connecticut and are therefore amenable to suit in this District.[49] Yet it is "an untenable leap of logic to jump . . . to the blanket assertion that a plaintiff's choice of forum deserves presumptive deference simply because the chosen forum is defendant's home forum." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 74 (2d Cir. 2003). And as Judge Cronan observed, while

---

[46] Doc. #58/1054 at 22; Doc. #67/1055 at 22.
[47] *Ibid.*
[48] Doc. #3/1054 at 4 (¶¶ 9-10); Doc. #4/1055 at 4 (¶¶ 9-10).
[49] Doc. #3/1054 at 4 (¶ 11); Doc. #4/1055 at 4 (¶ 11)

the Southern District of New York would also have been "relatively convenient for all GE Defendants since they are either at home here or in a nearby district," because "litigants rarely are concerned with promoting their adversary's convenience at their own expense," then the "plaintiff's choice of the defendant's home forum . . . suggests the possibility that the plaintiff's choice was made for reasons of trial strategy." *Aenergy*, 2021 WL 1998725, at \*9.

Third, the plaintiffs' choice of forum deserves less deference where they "chose to do business in Angola with various Angolan government entities." *Id.* at \*9. "Courts routinely have little sympathy for plaintiffs . . . who conduct business in foreign lands and later try to cry foul [in the United States]." *Ibid.* As the complaints allege, the plaintiffs set out to "change the way business was done in Angola."[50] Their decision to file suit in the United States—not once but twice—suggests the plaintiffs' commitment to Angola has waned only as the Angolan judicial system has failed to deliver the results they are seeking. This is a move that "smacks of forum shopping." *Id.* at \*10.

In addition, that "a substantial number of witnesses and a significant portion of relevant evidence are located in Angola or other places abroad . . . further weighs against Plaintiffs' choice of forum." *Ibid*. Each of the key events at issue in the complaint—the forging of the letters; the December 2018 meetings between AE, GE, and the Angolan parties in which the forgeries came to light; GE's meetings with Angolan officials to attempt to smooth out the misunderstanding; and Angola's ultimate decision to terminate the contracts with AE—appear to have taken place in Angola. And key witnesses including da Costa himself either remain in Angola or elsewhere or would not be amenable to a subpoena to testify in a United States court.

---

[50] Doc. #3/1054 at 6 (¶ 21); Doc. #4/1055 at 6 (¶21).

The plaintiffs argue that evidence remains abroad which Angolan courts are ill-equipped to obtain.[51] But what evidence? As Judge Cronan observed, "to the extent there was relevant evidence found only in the United States, AE took action under 28 U.S.C. § 1782 to ensure that it already arrived in Angola." *Aenergy*, 2021 WL 1998725, at *10; *see also In re Aenergy, S.A.*, 451 F. Supp. 3d 319 (S.D.N.Y. 2020) (noting AE's Section 1782 application seeking non-party discovery from GE in aid of foreign litigation in Angola). The plaintiffs offer no concrete rebuttal.

The plaintiffs also claim that while "GE's United States-based employees [we]re unlikely to be crucial witnesses" in the New York action, because this action involves only the GE defendants, the "key witnesses will be . . . GE witnesses."[52] But again, "GE's United States-based employees . . . are alleged only to have relied on and received reports and updates from GE's employees in Angola." *Aenergy*, 31 F. 4th at 133. According to the complaint, da Costa continuously misinformed his GE colleagues as to the substance of his conversations with AE and Angolan government officials.[53] Any testimony GE's United States-based employees would be able to provide, therefore, would be significantly less informative than testimony from da Costa himself or from Angolan government officials involved in the decision to ultimately terminate AE's contracts.

---

[51] Doc. #58/1054 at 23; Doc. #67/1055 at 23.

[52] Doc. #58/1054 at 22-23; Doc. #63/1055 at 22-23.

[53] *See also* Doc. #3/1054 at 22 (¶ 55) ("Mr. da Costa informed his GE colleagues . . . that Mr. Machado had told him the OSCs covered twelve TM2500s."); *id.* at 29 (¶ 69) ("GE Capital again relied upon Mr. da Costa as their agent for purposes of obtaining the requisite documentation."); *id.* at 31 (¶ 75) (da Costa transmitted the forged letters to relevant persons within GE); *id.* at 42 (¶ 104) (da Costa told GE executives that MINEA had agreed to change the scope of the OSCs to include two more turbines); *id.* at 46-47 (¶¶ 113-14) (da Costa and Sezan summarize the December 2018 meetings with MINEA to the US-based GE employees); *id.* at 49 (¶ 121) ("GE Capital [employees] continued to rely upon Mr. da Costa in interacting with the Angolan government.").

The plaintiffs respond that because Angola is no longer a party to this action, "Angola's officials are no longer key witnesses."[54] Instead, "the principal questions will be whether GE entities committed torts."[55] But the plaintiffs explain that "the tort here is . . . that, in and after December 2018 [da Costa] and others . . . falsely accused AE of irregularities" in meetings with Angolan government officials, and that the defendants tortiously interfered with the plaintiffs' contracts *with the Angolan government.*[56] It is hard to imagine that proving up this case will not require any testimony from said Angolan officials as to, *e.g.*, what the GE employees told them regarding the fabricated letters and what involvement, if any, the GE defendants had in the Angolan government's decision to terminate its contracts with AE.

In short, none of the "new" factors in this case change the analysis as to the first step of the *forum non conveniens* analysis. As was true for the New York action, the plaintiffs' choice of forum still does not warrant significant deference.

### Step two—adequate alternative forum

Under step two, the Court must determine whether there exists an "adequate alternative forum" where (1) "the defendants are amenable to service of process," and (2) which "permits litigation of the subject matter of the dispute." *Pollux Holding Ltd.*, 329 F.3d at 75.

As to subpart one, both defendants have again reiterated that they will not challenge the Angolan court's jurisdiction if the plaintiffs ultimately file suit in Angola.[57] *See also Aenergy*, 2021 WL 1998725, at *12 (GE defendants consent to service in Angola). So they are amenable to service of process in Angola.

---

[54] Doc. #58/1054 at 22; Doc. #63/1055 at 22.
[55] *Ibid.*
[56] Doc. #58/1054 at 43; Doc. #63/1055 at 43.
[57] Doc. #40-1/1054 at 32; Doc. #41-1/1055 at 31.

As to subpart two, I must consider whether Angolan courts permit litigation of the "subject matter" of the dispute. The inquiry at this stage is not whether the "alternative forum . . . provide[s] procedures and causes of action identical to those in plaintiff's preferred forum." *Lust v. Nederlandse Programma Stichting*, 501 F. App'x 13, 14-15 (2d Cir. 2012). Rather, "[s]o long as it entertains causes of action encompassing the type of conduct covered by the cause of action in the United States, the alternative forum may be deemed adequate." *Ibid.*

A declaration from Angolan law professor Sofia Vale confirms that there exist analogous claims the plaintiffs could bring in an Angolan court on theories of both contractual interference and interference with prospective economic relations. As Professor Vale explains, "[a] claim regarding interference of a non-contracting party with a contract, by disseminating information capable of hindering the reputation and the good name of a contracting party, causing the other contracting parties to repudiate the contract, may be brought before Angolan courts, under tort liability."[58] Similarly, "[a] claim regarding damages allegedly caused to Plaintiffs by the GE Defendants related to the loss of future contracts, which allegedly were already being negotiated between the Plaintiffs and the Angola Defendants, may be brought before Angolan courts, under tort liability."[59]

Indeed, as Judge Cronan observed, the plaintiffs' claims "involve humdrum commercial-law principles" that would "seem to exist in most jurisdictions around the world" and could "certainly . . . be heard by an Angolan court." *Aenergy*, 2021 WL 1998725, at *12. The Second Circuit agreed, noting that "the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies," but

---

[58] Doc. #43-26/1054 at 22-23 (¶¶ 2.4.4-2.4.5.2) (citing cases).
[59] *Id.* at 23-24 (¶¶ 2.4.6-2.4.6.2) (citing relevant scholarly work).

rather on whether the foreign court can "address the essential subject matter of the dispute." *Aenergy, S.A.*, 31 F.4th 119 at 130-31.

The plaintiffs respond that while Angola may have been an adequate forum in 2020 when the New York action was first filed, it is no longer true. Relying on a declaration from Alberto Raimundo, a lawyer practicing in Angola, the plaintiffs claim that any action for tort they might have brought against the GE defendants is now time-barred by Angola's three-year statute of limitations.[60]

Certainly, "an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." *Bank of Credit and Commerce International (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001). And a district court cannot "fault [the plaintiff] for allowing [foreign] filing deadlines for alternative actions to lapse," as "[t]he second step of *forum non conveniens* analysis does not concern itself with the reason why an alternative foreign forum is no longer available; its singular concern is the fact of present availability." *Norex Petroleum Ltd.*, 416 F.3d at 159.

But the broad and conclusory assertions in the Raimundo declaration leave much to be desired. Does the Angolan statute of limitations begin ticking when the tortious conduct occurs, when it ends, or when the plaintiffs discover the alleged conduct? Does the three-year statute of limitations apply to any action in tort or only to specific types of claims? Does Angola recognize principles of equitable tolling that would pause the clock, perhaps while the United States-based

---

[60]Doc. #60/1054 at 6-7 (¶ 26) ("[T]here is no claim that could be asserted that would result in damages being awarded to the Plaintiffs."); *ibid.* (because "article 498 of the Angolan Civil Code establishes a limitation period of 3 years," then "at this point in time" any tort claims the plaintiffs may wish to file in Angola against the GE defendants would be untimely).

litigation was pending? Some other sources suggest, for example, that the limitation period for civil claims in Angola is based on a "multiplicity of special rules."[61]

In any case, counsel for the GE defendants have agreed to waive applicable statutory limitation defenses in Angola, which alleviates remaining concerns about the availability of analogous claims in Angolan courts. *See Wamai v. Industrial Bank of Korea*, 2023 WL 2395675 (2d Cir. 2023) (conditioning dismissal on waiver of any statute of limitations defenses removed concerns about the adequacy of Korea as an alternative forum); *Figueiredo Ferraz E Engenharia de Projeto Ltda. V. Republic of Peru*, 665 F.3d 384, 394 (2d Cir. 2011) (dismissal conditioned on parties' consent to suit in Peru, including a waiver of any otherwise applicable statute of limitations); *USHA (India), Ltd. V. Honeywell Intern., Inc.*, 421 F.3d 129, 136 (2d Cir. 2005) (same regarding Republic of India).

The plaintiffs next argue that even if they have a valid cause of action against GE in Angola, they will not be able to get a fair hearing and obtain a remedy in Angolan courts. "An alternative forum is not adequate when there is a complete absence of due process or an inability of the forum to provide substantial justice to the parties." *Palacios*, 757 F. Supp. 2d 347, 355 (S.D.N.Y. 2010). But the plaintiffs' litany of complaints rehashes the same arguments Judge Cronan rejected as insufficient to show Angolan courts are too corrupt to be able to judge the plaintiffs' case fairly.[62]

"[I]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Aenergy*, 31 F.4th at 132. Judge

---

[61] Sapna Jhangiani & Julie Klein, Delos Guide to Arbitration Places 1 (March 2023); *A Multi-Jurisdictional Review: Dispute Resolution in Africa*, Herbert Smith Freehills 22 (September 2016) (suggesting the general limitations period for civil claims in Angola is 20 years). A court "may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence" when determining an issue about a foreign country's law. *See* Fed. R. Civ. P. 44.1.
[62] Doc. #63/1055 at 26-29.

Cronan was unsympathetic to the plaintiffs' "gripe . . . that an Angolan court held an *ex parte* proceeding at which it issued an injunction that allowed Angola to seize some of AE's turbines and other assets." *Aenergy*, 2021 WL 1998725, at *13. He noted that "courts in this country hold *ex parte* hearings in appropriate circumstances" and declined to consider this evidence of Angola's corruption. *Ibid.*

The plaintiffs object that circumstances have changed in the time between the New York action and now. While Angola represented to Judge Cronan that AE's turbines had been seized to "preserve evidence," the Angolan energy ministry has since taken the turbines and hooked them up to the power grid.[63] But this is not news. On appeal to the Second Circuit the plaintiffs complained that the seized turbines "went to state-owned power companies that have since deployed them." The Second Circuit was unmoved, finding that this "suggest[ed] at most that the Angolan court's trustee has failed to fulfill its obligations." *Aenergy*, 31 F.4th at 131.

AE advises by way of supplemental briefing that in 2022 Angola seized two more AE turbines without notice, supposedly as part of a "criminal investigation," but that those turbines are now in possession of MINEA rather than the criminal authorities.[64] If so, this demonstrates no more than "executive, not judicial misconduct." *See Aenergy, S.A. v. Republic of Angola*, 2023 WL 4075627, at *5 (D.D.C. 2023) (rejecting the same facts as evidence of a lack of due process in Angola).

The plaintiffs next point out that since seizing the turbines "the Angolan court [has] refused to hear any of Plaintiffs' evidence and refused Plaintiffs' appeal, and there [has been] no plenary proceeding."[65] That statement is hyperbolic. The Raimundo declaration states that AE

---

[63] Doc. #58/1054 at 28; Doc. #63/1055 at 28.
[64] Doc. #74/1054 at 2.
[65] Doc. #58/1054 at 27-28.

has yet to receive a final decision on its appeal of the seizure, not that the Angolan court has ordered permanent relief without recourse to the proper adversary process.[66] *See also Aenergy*, 31 F.4th at 132 ("AE does not dispute that the court has ordered only preliminary relief, and where permanent relief requires an adversary process of the sort now underway.").

Nor am I moved by the plaintiffs' argument that the Angolan Supreme Court's failure to issue a decision in their case for three years demonstrates that Angola is an inadequate forum.[67] Three years is within the average duration for the litigation process in Angola as described by Professor Vale, who additionally notes that if an appeal is filed the "period of time will be extended."[68] And "[Connecticut] courts are not a fallback option for foreign plaintiffs whenever their homeland's wheels of justice may not spin fast enough for their liking." *Aenergy*, 2021 WL 1998725, at *16.

Finally, the plaintiffs cite various reports describing the Angolan judiciary as in the pocket of the president, lacking adequate separation of powers, and plagued by corruption.[69] But these reports simply rehash the same points Judge Cronan rejected as too vague and general to show that Angola is an inadequate forum for this case. *See Aenergy*, 2021 WL 1998725, at *14 (referring to a 2019 State Department Country Report that recognized "political influence in the decision-making process" of the Angolan judiciary, that "government corruption at all levels was widespread," and that found the Angolan judicial system "lacks resources and independence to play an effective role"). And the plaintiffs' assertion that the president of Angola exercises

---

[66] Doc. #60 at 3 (¶ 12).
[67] Doc. #58/1054 at 27; Doc. #4/1055 at 27.
[68] Doc. #43-26/1054 at 14 (¶ 2.1.6.17).
[69] Doc. #58/1054 at 26-27; Doc. #63/1055 at 26-27.

unilateral control over appointments to the judiciary ignores a complex process that involves the input and decisionmaking of many actors, not just the president.[70]

Neither does a statement by President Lourenço of Angola that the plaintiffs "lost the case" in the United States and disparaging them as an "intermediary" run by a "foreigner" weigh against dismissal. The plaintiffs take issue with the president's failure to appreciate that the Second Circuit had dismissed the case on procedural grounds and take his remarks as evidence that he has prejudged their position.[71] But these statements are hardly incendiary enough to indicate that the plaintiffs will never get a fair trial in Angola.

The plaintiffs have not succeeded in showing that they cannot get a fair consideration of their claims in Angola. I find that Angola remains an adequate alternative forum for this suit.

### Step three—private and public interest factors

Finally, I turn to the last element of the *forum non conveniens* analysis—a balancing of the private and public interest factors in the case. *See Pollux Holding Ltd.*, 329 F.3d at 74-75; *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947). The private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73-74. This analysis requires courts to compare the "hardships [the] defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Id.* at 74.

"[T]he underlying events took place almost entirely on Angolan soil among Angolan parties," suggesting that the private interest factors weigh heavily in favor of litigating this case

---

[70] Doc. #43-26/1054 at 15-17 (summarizing the appointment process for judges in Angola).
[71] Doc. #58/1054 at 28; Doc. #63/1055 at 28.

in Angola. *Aenergy*, 2021 WL 1998725, at *16. The contracts with which the GE defendants allegedly interfered were executed in Angola with the goal of "deliver[ing] cost-effective, reliable, and environmentally-friendly energy solutions" to the Angolan people.[72] Da Costa's alleged forgery of the intent letters took place from his home in Angola.[73] He then showed these forged letters to representatives from MINEA and AE at a meeting also presumably in Angola, culminating in the Angolan government's decision to terminate its contracts with the plaintiffs and transfer the remaining work under the OSCs to GE.[74]

In response the plaintiffs try for a second bite at many of the same arguments that were rejected in the New York action. First, the plaintiffs point out that while the United States allows testimony and depositions to take place via videoconference, Angola does not, making Angola a less convenient forum for foreign witnesses.[75] But under "binding Second Circuit precedent . . . courts continue to assess" the "location of witnesses and evidence" despite the advent of "modern technologies" which "make the location of witnesses and documentary evidence less important." *Aenergy*, 2021 WL 1998725 at *18.

The plaintiffs next hang their hat on Judge Cronan's offhand statement that the United States would be "relatively convenient" for the GE defendants. But they ignore his subsequent observation that this relative convenience "does not meaningfully move the needle," because "many Angolan state officials . . . would serve as witnesses in this case" and "[t]here are also many employees or former employees of AE and GE who seem to reside in Angola, other parts of Africa, or Europe." *Aenergy*, 2021 WL 1998725, at *17.

---

[72] Doc. #3/1054 at 6 (¶ 21); Doc. #4/1055 at 6 (¶ 21).
[73] Doc. #3/1054 at 30-31 (¶ 74); Doc. #4/1055 at 30-31 (¶ 74).
[74] Doc. #3/1054 at 54-55 (¶ 136); Doc. #4/1055 at 54-55 (¶ 135); *see also Aenergy*, 2021 WL 1998725, at *16.
[75] Doc. #58/1054 at 29-30; Doc. #63/1055 at 29-30.

The plaintiffs respond that now that the Angolan defendants are no longer in this case, the Angola-based witnesses are no longer central to the analysis. But the Second Circuit "disagree[d] with AE's argument that the testimony of Angolan government witnesses does not meaningfully bear on the precise issues that are likely to be actually tried." *Aenergy*, 31 F.4th at 133. Angolan government witnesses "may offer testimony on important topics, including GE's alleged efforts to convince Angola to allow it to take over AE's contracts and the basis and good faith of Angola's alleged claim of contractual irregularities." *Ibid.* This information remains critically important to the plaintiffs' tortious interference claims against GE.[76]

The plaintiffs also raise the issue of a United States court versus an Angolan court's ability to subpoena da Costa, Nelson, and Sezan to testify at trial. Undoubtedly these three witnesses are important to the case—it is da Costa's alleged forgery, seemingly facilitated by Nelson and Sezan, that precipitated the events in the complaint. The plaintiffs argue that since all three of these individuals are either nationals or residents of the United States they are subject to subpoena by a U.S.-based court under 28 U.S.C. § 1783.[77] In contrast, Angolan courts have much more limited abilities to induce foreign nationals to come to Angola to testify.

But the available record suggests that the residence and citizenship of these three individuals is more complicated. As to da Costa, the plaintiffs contend that he currently resides in Cameroon and is a U.S. citizen or resident. But as evidence of da Costa's residence the plaintiffs submit only a declaration from Machado in which he admits that he "do[es] not have

---

[76] At oral argument the parties also discussed the plaintiffs' proposal to the Second Circuit that the case could proceed against the GE defendants only, which the Second Circuit declined to entertain.

[77] The section allows for a court of the United States to issue a subpoena requiring a national or resident of the United States in a foreign country to testify or produce evidence, if: (1) the court finds that particular testimony or evidence "is necessary in the interest of justice," and (2) the court finds that "it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner."

first-hand knowledge of Mr. Da Costa's current whereabouts."[78] The plaintiffs have also

submitted a copy of da Costa's green card, which appears to have expired in 2019 and

additionally states that da Costa's country of birth is Angola.[79] This suggests that da Costa may

no longer be a United States resident and may be an Angolan national whom the plaintiffs' own

Angolan-law witness states can be "requested by certified mail . . . [to] come to Angola to

testify."[80] *See also Aenergy*, 31 F.4th at 134 ("Da Costa may not be a U.S. resident, as his green

card appears to have expired in 2019.").

As to Nelson, the plaintiffs have submitted a copy of his U.S. passport. And as to Sezan

there is no allegation that he is a current resident or national of the United States. The plaintiffs

have therefore shown at best that one GE witness—Nelson—may be more available in a U.S.

court than in an Angolan court. But they have not demonstrated that the importance of Nelson's

testimony outweighs the importance of, for example, the testimony of witnesses from the

Angolan government who would not be available to testify in this Court because the Angolan

government entities are no longer parties to this case.[81] *See Aenergy*, 2021 WL 1998725, at *17

n.7; *Aenergy*, 31 F.4th at 134 ("[E]ven assuming that da Costa and Nelson could be made

available in New York, the District Court did not abuse its discretion in giving priority to the

testimony of officials from the Angolan government.").

And none of this contradicts the fact that "even if the Court could compel some witnesses

to come to [Connecticut] to testify, or they agreed to do so, this would be very costly." *Aenergy*,

---

[78] Doc. #63/1054 at 6 (¶ 17.b).

[79] Doc. #52/1055.

[80] Doc. #60/1054 at 10 (¶ 40). The Raimundo affidavit states that this is only a request but goes on to say that if a foreign-located witness does not appear, then a letter rogatory will have to be served—again suggesting that Angolan courts have recourse to get da Costa to appear to testify. *Ibid.* And da Costa might similarly ignore a subpoena from a U.S.-based court. *See Gateway Bank v. GMG Brokerage Services, Inc.*, 2002 WL 32002677, at *1 (D. Conn. 2002) (witness ignored subpoena issued pursuant to 28 U.S.C. § 1783 and served on him in the Cayman Islands).

[81] Doc. #40-1/1054 at 33.

2021 WL 1998725, at *17 (citing *Palacios*, 757 F. Supp. 2d at 361, for the proposition that the cost of obtaining the attendance of cooperative witnesses at trial mitigates, modestly, in favor of dismissal).

The plaintiffs next point out that all of the GE Capital witnesses are located in the United States, England, or Australia and as such can be compelled to give evidence under the Hague Evidence Convention.[82] But the plaintiffs still do not refute that these "United States-based employees are alleged principally to have relied upon and received reports from GE's employees in Angola." *Aenergy*, 13 F.4th at 134. And so the ease of access to these witnesses cannot outweigh the *lack* of access to more essential witnesses like Angolan government officials.

Neither do the plaintiffs meaningfully dispute that the need for translation weighs strongly in favor of Angola. As Judge Cronan found, the parties "did business primarily in Portuguese." *Aenergy*, 2021 WL 1998725, at *18. And while "many of GE's documents may be in English, it seems that the vast majority, if not all, of AE's and the Angolan [parties'] documents are in Portuguese." *Ibid.* Similarly, "trial testimony from non-English speaking witnesses (or those that may speak some English but nonetheless would prefer to testify in another language) would require the assistance of interpreters," which would be a "costly, difficult endeavor" that "puts Angolan courts in a much better position to consider evidence . . . and witness testimony." *Ibid.*

The plaintiffs respond that in a recent arbitration hearing in London twenty fact witnesses testified in English and relevant internal AE documents were translated from Portuguese into English, saving the incremental costs of additional translation.[83] But the London Arbitration was between GE Packaged Power—a separate GE affiliate not named as a defendant in this case—

---

[82] Doc. #67/1055 at 33.
[83] Doc. #67/1055 at 34.

and AE regarding the breach of the parties' Framework Agreement, a contract also not at issue in this case.[84] Are all the English-speaking witnesses in that arbitration also important witnesses in this case? Are the translated documents relevant to this case? The plaintiffs do not elaborate.

The plaintiffs finally reiterate Machado's "grave security concerns" with returning to Angola.[85] As did Judge Cronan, I take this consideration seriously. But "because all other private interest factors weigh in favor of dismissal, the Court is unpersuaded that such fears tip the balance in a meaningful way." *Aenergy*, 2021 WL 1998725, at *19.

Finally, I turn to the public interest factors, including: "administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002).

There can be little doubt that "the interest in having localized controversies decided at home" weighs heavily in favor of Angola. *Aenergy*, 2021 WL 1998725, at *19. This case centrally concerns whether GE interfered with "contracts between Angolan energy companies and the Angolan government to provide power to the Angolan people." *Ibid.* None or few of the alleged events—not even, seemingly, the intra-GE meetings—took place in Connecticut. And so this case still has "little to do with [Connecticut] and a lot to do with Angola. . . . Whatever interest [Connecticut] has in the conduct of GE in Angola is outweighed by the interest of Angola in adjudicating this dispute." *Ibid*.

The plaintiffs respond that Connecticut, as the defendants' home forum, has a strong interest in regulating the conduct of its corporate citizens. But as the Second Circuit

---

[84] Doc. #3/1054 at 58 (¶ 147).
[85] Doc. #58/1054 at 31; Doc. #63/1055 at 31.

acknowledged, any interest "the United States has . . . in regulating its corporate citizens . . . is relatively limited, and Angola has a significantly stronger interest in addressing disputes related to its government contracts." *Aenergy*, 31 F.4th at 134.

Finally, choice-of-law principles dictate that Angolan law would apply to the plaintiffs' substantive claims. Under Connecticut law, "the most significant relationship test outlined in §§ 6(2) and 145 of the Restatement (Second) of Conflict of Laws is the proper test to apply in tort actions to determine which state's law applies."[86] *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 552 n.9 & 557 (2016). Under section 6(2), "the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." And pursuant to section 145, "[c]ontacts to be taken into account in applying the principles of section 6" include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

Of these factors only part 145(c) weighs in favor of Connecticut. All other factors point to Angola as the proper forum with the most significant relationship to the events at issue. This suggests that Angolan law (which is conducted in Portuguese) applies to the plaintiffs' substantive claims in this case. *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009) (where

---

[86] The plaintiffs seem to counter that because the GE defendants cite Connecticut substantive law on their 12(b)(6) motion to dismiss that makes Connecticut law the governing standard. That is not the test.

injuries and alleged misconduct occurred in Nigeria, plaintiffs were Nigerian residents, and the parties' relationship centered in Nigeria, then § 145(2) factors pointed towards applying Nigerian law). And because *forum non conveniens* "is designed in part to help courts avoid conducting complex exercises in comparative law," the applicability of Angolan law in this case counsels heavily in favor of dismissal. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 251 (1981).

In short, as Judge Cronan found and the Second Circuit affirmed, the proper forum for this case—which relates to energy contracts entered into with the Angolan government by an Angolan company for projects taking place in Angola—is not Connecticut but Angola. Accordingly, I will conditionally grant the defendants' motion to dismiss on the ground of *forum non conveniens*.

### CONCLUSION

For the reasons stated above, the Court conditionally GRANTS the defendants' motions to dismiss, subject to the defendants' filing of a stipulation agreeing to litigate in Angola, which shall include a commitment by the defendants GE Capital and GE International to accept service in Angola and waive any jurisdictional or statute of limitations defense. The defendants shall file such a stipulation by **July 28, 2023**. Upon filing of that stipulation, judgment will be entered for the GE defendants, and this case will be closed.

It is so ordered.

Dated at New Haven this 21st day of July 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge